Bridget McCarty

*v.*

Patrick Kearnan.

1. Sanity—*presumed, and evidence to overcome the presumption must be clear.* Sanity and intellectual capacity being the rule, with comparatively few exceptions, the presumption must prevail until rebutted, that all acts performed by adult persons are binding, and the evidence to overcome this presumption must be clear and satisfactory.

2. Deed — *by party under apprehension of death — when revocable, like a will.* A deed made by a person supposed to be about to die, in consideration of services rendered by the grantee and as a recompense therefor, is not a *donatio causa mortis,* and revocable, like a will, but vests the title in the grantor irrevocably.

3. A woman, being sick and apprehensive of death, sent for a justice of the peace to direct the authentication of a will prepared some years before, but not signed. Before signing the will she was reminded by one who had worked for her of his claim for services, and she recognized the claim, and said she intended to give him twenty acres of land and make him a deed for it, whether she lived or died. Thereupon she executed and delivered to him a deed, and then executed the will. She afterwards recovered, and, upon a bill filed by her to set aside the deed, it was *held* not to be a *donatio causa mortis* and revocable, like a will, but an absolute and irrevocable conveyance for a sufficient consideration.

Appeal from the Circuit Court of Jo Daviess County; the Hon. William Brown, Judge, presiding.

Mr. M. Y. Johnson, for the appellant.

Mr. Louis Shissler, for the appellee.

Mr. Justice Walker delivered the opinion of the Court:

It appears that appellant was the owner of 240 acres of land in Jo Daviess county. That about February 22, 1873, being sick, and apprehensive of her approaching dissolution, appellee was sent for a justice of the peace to direct the authentication of a will which appears to have been drawn, but not executed, two or three years previously, and for a priest to administer the spiritual consolations of the church. On the arrival of the justice, McCarty, who was there, went to see about the justice's horse, and, whilst he was absent, appellee had an interview with appellant, in which he says he said to her : " You told me you did not want my labor for nothing. You always said you would recompense me for it. Here is Black, now, going to have the will fixed." She said : " If you had never spoken of it, I would have that fixed. I will give twenty acres of land and make you a deed for it. Whether I live or die, no one can take it from you."

The justice of the peace testified that, on entering the

room with the priest, McCarty and she were the only per-
sons there; that he said to her that the man who had gone
for him said she wanted him to witness or acknowledge a
will.   She replied, saying she wanted the will altered, or
asked him as to the best way to give Kearnan twenty acres
of the land.   That he advised the making of a deed before
the execution of the will, to which she assented; that
McCarty objected, but she said he had been a good boy to
her, and she would give him the twenty acres; that after
considerable quarreling it was decided to make the deed;
that a difficulty then arose as to the shape of the twenty
acres — whether it should be square or taken from one side
of an eighty-acre tract; that appellee and she wanted it
square, and McCarty, taken from the side of the eighty-
acre tract; and that she yielded, and the deed was so made.
She signed and acknowledged it and appellee paid her a
dollar as the consideration, and gave it to witness to have it
recorded.   The will was then signed by appellant and
McCarty, it being a joint will.   That she was sitting or
standing by the stove.   He says she certainly understood
what she was doing in making the deed and will.

The priest, with less detail, gives in substance the same
account of the transaction : that she confessed to him, and
he administered to her the sacrament of the church; after
which she asked him to perform the marriage ceremony
between her and McCarty, and on producing a license
he did so; and he is clearly of the opinion that she con-
versed with him and the justice intelligently; that if she
had not, he would not have performed the marriage cere-
mony.   This witness further testified that McCarty did
not want her to give Kearnan the land, but she said she
wanted to give it to him on account of the services he had
rendered her, and insisted he should have the land.

Having recovered from her sickness, she subsequently
filed this bill to set aside the deed, but the court below, on
a hearing, dismissed the bill for want of equity; and com-
plainant brings the record to this court and asks a reversal.

In favor of reversal it is insisted that the deed was obtained by fraud; that it was without consideration, and made *donatio mortis causa;* and that she did not knowingly and intentionally execute it. Was she then *compos mentis?* Appellee, Black, the justice, and the priest all testify to facts strongly tending to show she was. On the other hand she testifies that she knew nothing of the transaction, or her marriage, or the execution of the will. Dr. Caldwell, the physician, gives it as his opinion that she was feeble physically and mentally — that she was not mentally capable of transacting business; and Mrs. O'Neil says she was mentally feeble. O'Neil gives no opinion as to her mental condition; nor does her husband. The justice of the peace and the priest, on the other hand, seem to have no doubt as to her mental capacity to understand, and that she did comprehend all she did. On reading all of the evidence we are decidedly of the opinion that she was of sound mind and memory, certainly to the extent the law requires to render her acts valid and binding.

If the circumstances detailed by Black and the priest occurred as they detail them — and we can see no reason to doubt their evidence — it would seem almost impossible to believe that she was not capable of legally performing each and all of these acts. What she did and said was rational, and was entirely pertinent to the business then being transacted. They were actors taking an active part in the transaction, and, from their position in discharging their various duties, they would undoubtedly, as they say, have refused to proceed if they had believed she was incompetent to act. It would have been a gross violation of Black's official duty to take an acknowledgment of a deed from her had he believed she was mentally incapacitated to act. It would have been aiding in the perpetration of a gross fraud, that no officer can be permitted to aid in consummating. But, taking into consideration all the circumstances, we must hold she was competent to act. The physician gives no facts upon which he bases his opinion, except she had

lung fever which affected her mind, and that she was " so befogged in her intellect " that he " was unable to get from her anything like an intelligent history of the beginning and progress of her disease." That was no doubt strong evidence of confused ideas, or at least a want of clear perceptions in reference to that matter; but it by no means follows that her mind was not clear on other and business subjects.

Sanity and intellectual capacity being the rule with comparatively few exceptions, the presumption must prevail, until rebutted, that all acts performed by adult persons are binding. And to overcome this presumption the evidence must be clear and satisfactory. But in this case it fails to preponderate against its validity; on the contrary, independent of the presumption of legal capacity, it sustains the validity of the deed.

Nor does the evidence sustain the charge of fraud. At most it only appears that appellee claimed compensation for services he had rendered, and she recognized the claim and proposed to cancel it by the conveyance of this land, and he accepted it in satisfaction. He had for several winters previously cut wood, fed stock, and did house and other work for her. It is true that there seems never to have been any definite understanding as to what he was to be paid. Yet his labor was of value to her, and had she obtained it from others she would doubtless have been compelled to pay a considerable amount for it. And we may reasonably conclude that both parties expected it to be paid, as he claimed it and she recognized the claim as being just. And not only so, but when her present husband, with whom she was then engaged, and to whom she was in an hour afterwards married, remonstrated against conveying the land to appellee, she said she would do so on account of his services. Although McCarty had influence enough to prevent her from conveying it in a square piece, and to induce her to convey it in a strip across an eighty-acre tract, her sense of justice resisted his opposition to her

making any conveyance. And Black says that she did so after considerable " quarreling." The record is barren of evidence of any device, trick, misrepresentation, or false pretenses used by appellee to induce the conveyance; and we must hold that fraud is not established.

From what has been said it follows that this was not a *donatio mortis causa*, but was a sale on a sufficient consideration to support the conveyance. And if we are correct in the conclusion that there was a sufficient consideration to support it, then there can not be the slightest claim that it was a mere gift in apprehension of death, to operate only as a devise, and subject, like a devise, to revocation at the pleasure of the donor. A sufficient consideration having been paid, the title vested absolutely, and from the delivery of the deed, as in any other sufficient conveyance, it became irrevocable. The entire record considered, we are of the opinion that the errors are not well assigned, and the decree is affirmed.

*Decree affirmed.*